UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DESSI RAE HUNT, | CASE NO. 1:21-CV-00075-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Dessi Rae Hunt filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On January 12, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation (Non-document entry of January 12, 2021), and was subsequently reassigned to me pursuant to General Order 2021-06 (Non-document entry of May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

PROCEDURAL BACKGROUND

Ms. Hunt filed for DIB on June 30, 2016, alleging a disability onset date of March 9, 2016. (Tr. 363). Her claims were denied initially and on reconsideration. (Tr. 174-85, 187-204). She then requested a hearing before an Administrative Law Judge. (Tr. 250-51). Ms. Hunt (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on June 29, 2018. (Tr. 109-73). On November 14, 2018, the ALJ issued a written decision finding Ms. Hunt not disabled. (Tr. 206-21).

The Appeals Council granted Ms. Hunt's request for review and remanded the case for the ALJ to offer Ms. Hunt a new hearing, take action necessary to complete the administrative record, and issue a new decision. (Tr. 231-32). A hearing was held on July 20, 2020. (Tr. 61-108). On August 14, 2020, the ALJ issued a written decision again finding Ms. Hunt not disabled. (Tr. 38-52). The Appeals Council denied Ms. Hunt's request for review, making this the final decision of the Commissioner. (Tr. 1-4; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Hunt timely filed this action on January 1, 2021. (ECF #1).

FACTUAL BACKGROUND[1]

I.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Hunt and VE Harry Cynowa presented during the second hearing before the ALJ on July 20, 2020.

---

[1]     Ms. Hunt only raises error with the ALJ's consideration of the opinions of her treating psychiatrist, James Rodio, M.D. (Pl.'s Br., ECF #14, PageID 2495-99). Ms. Hunt has submitted a fact sheet indicating the facts relevant to her claim. (ECF #14-1). I therefore summarize here the relevant hearing testimony and record evidence as presented in her fact sheet.

Ms. Hunt testified she had been consistently on medication (Effexor, Vyvanse, Lamictal, prazosin, and Klonopin) during periods of housing instability. (Tr. 90-91). Her prescribed medications have remained mostly stable, although the dosage has increased. (Tr. 91). Ms. Hunt stated that her doctor had indicated "there may be a slight improvement with a consistent living situation, but he does not believe that it'll [Ms. Hunt's mental health issues] ever go away." (*Id.*). Ms. Hunt stated, "I'm much better [on medication] than off them, but I'm not much better on them consistently . . . if I wasn't on my medication, it would be much worse. But even on medication, I'm not showing enough improvement, and that's why [Dr. Rodio] has increased some of my dosages and has been very concerned about the fact that I'm not getting any better." (Tr. 91-92). Dr. Rodio indicated to Ms. Hunt he would like to increase her Vyvanse and Effexor dosages; she is on the highest dose, but Dr. Rodio believes it can be slightly increased. (Tr. 97).

Ms. Hunt testified she experiences significant side effects from her medication, including losing her train of thought, sexual side effects, dizziness, losing balance, and falls. (Tr. 92-93). When Dr. Rodio decreased Ms. Hunt's prazosin dosage due to the side effect of dizziness and falls, she began having nightmares; Dr. Rodio increased the prazosin dosage again. (*Id.*). Ms. Hunt still experiences ongoing dizziness and frequent nightmares on her current dosage of prazosin, although each side effect is lessened from before. (*Id.*).

Ms. Hunt has been hospitalized for mental health episodes that have ended in self-harm. (Tr. 97). Ms. Hunt experiences PTSD when she is hospitalized during these episodes. (Tr. 97-98). She is afraid that if she is admitted to the hospital, they will keep her and never let her out. (Tr. 98). She will lie and indicate she is feeling better to manipulate the doctors into releasing her. (Tr. 97-98).

Ms. Hunt testified she experiences deep depressive episodes during which she is unable to take care of herself. (Tr. 100). She has gone for weeks without a shower. (*Id.*). She does not eat during these episodes. (*Id.*). She is unable to care for her service dog. (*Id.*).

VE Cynowa then testified. He identified Ms. Hunt's past work as a cashier, telephone solicitor, credit card clerk, and two positions as a medical assistant—one performed at light and one performed at medium exertion. (Tr. 101). The ALJ asked the VE to determine if a hypothetical individual of Ms. Hunt's age, education, and work history could perform her past work if limited to simple, routine, and repetitive tasks, but not at a production rate pace, *i.e.*, assembly line work; limited to simple work-related decisions and use of judgment and dealing with changes in the work setting; and limited to occasional interaction with supervisors and co-workers but never with the public. (Tr. 102). The VE testified such an individual could not perform Ms. Hunt's past work. (*Id.*). He identified positions such an individual could perform, including a hand packager (DOT 559.687-074), a small products assembler (DOT 706.684.022), and a visual inspector checker (DOT 222.687-010), all light, unskilled positions. (*Id.*).

If the hypothetical individual was additionally limited to never climbing ladders, ropes, or scaffolds, never being exposed to unprotected heights or moving mechanical parts, and never operating a motor vehicle, but being able to work in a loud noise environment, the individual would not be able to perform Ms. Hunt's past work but could perform in the light, unskilled positions identified above. (Tr. 103).

If the hypothetical individual was able to perform work at the medium exertion level but was subject to the limitations identified above, and additionally restricted to frequently climbing ramps and stairs, balancing, stooping, kneeling, crawling, and crouching, the individual would not

be able to perform Ms. Hunt's past work. (*Id.*). The VE identified other positions the individual could perform, including an office cleaner (DOT 381.687-018), a hand packager (DOT 920.587-018), and an order picker (DOT 922.687-058), all unskilled positions. (Tr. 103-04).

If the medium-exertion hypothetical individual was further limited to frequent interaction with supervisors and occasional interaction with coworkers and the public, the individual could perform the officer cleaner, hand packager, and order picker positions. (Tr. 104). If further reduced to no interaction with coworkers and the public, the individual would be precluded from all work. (*Id.*).

The VE testified employers tolerate an employee being off task ten to fifteen percent of the day. (Tr. 105). An employer would tolerate two absences in one month, but not on an ongoing or consistent basis. (*Id.*).

## II.   PERSONAL AND VOCATIONAL EVIDENCE

Ms. Hunt was 33 years old at the time of her alleged onset date, and 37 years old at the time of the administrative hearing. (Tr. 174). Ms. Hunt completed twelfth grade and has a high school education. (Tr. 50). In the past, Ms. Hunt has been employed as a cashier, telephone solicitor, credit card clerk, and medical assistant. (*Id*).

## III.   RELEVANT MEDICAL EVIDENCE

Ms. Hunt treats her mental health disorders with her psychiatrist, Dr. Rodio. (*See, e.g.*, Tr. 753-56). Ms. Hunt was diagnosed with PTSD and substance abuse disorder, with a history of abuse and features of depression and anxiety, including loss of motivation, anhedonia, insomnia/hypersomnia, hopelessness, loss of appetite and hygiene, sweating, increased heart rate, distraction with racing thoughts, and claustrophobia. (Tr. 753, 755).

Ms. Hunt presented to Dr. Rodio on May 10, 2016 after being admitted to the hospital for suicidality. (Tr. 753). She had overdosed on insulin while alone, and had thoughts of overdosing. (*Id.*). Dr. Rodio noted a 2009 hospitalization for using Xanax/methadone and cutting. (*Id.*). Ms. Hunt denied suicidal ideation and homicidal ideation during examination. (Tr. 755). Dr. Rodio continued Ms. Hunt on Prozac and Effexor and increased the Risperdal dosage. (Tr. 755-56).

Ms. Hunt has received treatment for sobriety in 2014 and 2015; at the time of examination, Ms. Hunt was attending Alcoholics Anonymous (AA) meetings and in a partial hospitalization program for her mental health and substance abuse. (Tr. 754).

On June 23, 2016, Ms. Hunt presented to Dr. Rodio, indicating she was feeling depressed, and had experienced recent flashbacks and residual nightmares, although her sleep was otherwise improved on Risperdal. (Tr. 757). She denied suicidal ideation, but stated, "I just kinda want to disappear." (*Id.*). Dr. Rodio increased Ms. Hunt's dosage of Effexor XR to 225 mg. (Tr. 759).

On August 18, 2016, Ms. Hunt had experienced increasing anxiety, resulting in cutting her left inner arm and subsequent hospitalization. (Tr. 760). She denied suicidal ideation at the examination but feared that her high anxiety would necessitate hospitalization. (*Id.*). Dr. Rodio stopped prescriptions for Buspar and Neurontin, continued her on the remaining medications, and added Klonopin 1 mg. (*Id.*). He also recommended weekly therapy sessions and that she follow up in six to eight weeks. (*Id.*).

On July 19, 2018, Ms. Hunt presented to Dr. Rodio complaining of high anxiety, ruminations and catastrophizing interrupting her sleep, and extreme mood swings. (Tr. 2098). She was without nightmares on prazosin 6 mg, but was sweating and restless and had fallen out of bed; she returned to a 4 mg dosage and could sleep successfully after struggling to fall asleep. (Tr. 2098-

99). She was free from drugs and alcohol. (Tr. 2099). Dr. Rodio noted her history of past trauma, including a 2010 kidnapping. (Tr. 2098). Flashbacks can limit her activity. (Tr. 2099). She again denied suicidal ideation on examination. (*Id.*). However, Dr. Rodio noted prior hospitalizations in 2009, 2014, 2015, 2016, and in February 2018. (Tr. 2098-99). Dr. Rodio indicated Wellbutrin made Ms. Hunt suicidal; he replaced Ms. Hunt's vilazodone with Trintellix 10 mg. (Tr. 2100). Dr. Rodio updated Ms. Hunt's diagnoses as PTSD, substance abuse disorder (in early remission), borderline personality disorder, major depressive disorder, and severe cannabis use disorder. (Tr. 2103).

On August 30, 2018, Ms. Hunt met with Dr. Rodio, who indicated she had been previously treated by a Dr. Mohan for a pattern of mood changes, including anhedonia, hopelessness, and lack of hygiene. (Tr. 2127). Dr. Rodio noted clinical descriptions of personality features (borderline personality disorder) affecting the stability of Ms. Hunt's decisions. (*Id.*). Ms. Hunt had nausea and itching on Trintellix; after an increase in the Trintellex dosage, she experienced reduced itching and manageable nausea. (*Id.*). Ms. Hunt reported extreme mood swings, periods of anxiety, and had cutting ideas two weeks previous with a down mood. (*Id.*). Although Dr. Rodio indicated Ms. Hunt's history of drug use, he also noted she was attending AA/NA meetings and had insight into the foundation of sobriety. (Tr. 2127-28). Dr. Rodio stopped Ms. Hunt's prescriptions for vilazodone and Trintellix. (Tr. 2128).

On October 17, 2018, Ms. Hunt reported increased anxiety on Effexor and that it keeps her at home. (Tr. 2128). She also noted anhedonia and lack of motivation. (*Id.*). She reported feeling anxious and unfocused; she denied suicidal ideation but noted "being weighted down with

self-negativity." (*Id.*). Dr. Rodio restarted Ms. Hunt's Lamictal prescription gradually and tapered Effexor with the intent to discontinue. (Tr. 2140).

On December 13, 2018, Ms. Hunt started taking Vyvanse from an old prescription and found herself more focused, motivated, accomplished, less impulsive, calmer, happier, more hopeful, and fell asleep naturally with less procrastination and anxiety. (Tr. 2145). She was better about checking her blood sugar and stabilized her insulin. (Tr. 2145-46). Ms. Hunt was attending AA sessions online. (Tr. 2146). Ms. Hunt reported an increase in Effexor "helped her get out of a period of poor hygiene and lack of appetite." (*Id.*). She had not had a recent mania episode with impulsivity or lack of schedule balance. (*Id.*). Dr. Rodio continued Ms. Hunt on Effexor and Vyvanse. (Tr. 2147).

On February 7, 2019, Ms. Hunt reported recent stress, restlessness, reckless spending, irritability, panic attack with vision loss, and several days of isolation. (Tr. 2158-59). Dr. Rodio increased her Vyvanse dosage. (Tr. 2160).

On March 26, 2019, Ms. Hunt experienced flashbacks while attending a funeral; she did not experience nightmares. (Tr. 2175). However, she reported feeling "edgy" and "tired." (*Id.*).

On June 6, 2019, Ms. Hunt reported that she was sober and maintaining positive parts of her personality; she was participating in online AA meetings with peer support. (Tr. 2196-97). She denied suicidal ideation and recent mania. (Tr. 2197-98). She was working with a therapist to help her talk to cashiers or other customers more easily. (Tr. 2198). Dr. Rodio instructed Ms. Hunt to taper and discontinue Topamax. (*Id.*).

On July 25, 2019, Ms. Hunt's therapist reported to Dr. Rodio that Ms. Hunt was experiencing hypomanic to manic features that day—she was "a little more anxious and on the

verge of hypomanic all week." (Tr. 2215). Ms. Hunt's Topamax was stopped. (*Id.*). Ms. Hunt

believes she was overall stable, as she had had a period of up to three days without a severe mood

swing. (Tr. 2215-16).

On December 30, 2019, Ms. Hunt reported "manic insanity for almost all of September –

[she] found that sleeping was better than hospitalization." (Tr. 2050-51). She was working with her

therapist again after missing appointments. (Tr. 2051). She denied drug use. (*Id.*). Her thoughts

had circumstantial wanderings but were reality-based; she had no hallucinations or delusions; she

demonstrated global baseline concentration and memory. (*Id.*). Dr. Rodio noted Ms. Hunt "has

insight into the foundation of sobriety, judgment to further work to maximize her medications

and maintain a schedule." (Tr. 2051-52). Dr. Rodio continued her Vyvanse and Effexor XR

prescriptions, restarted Topamax, and reduced prazosin. (Tr. 2052). Dr. Rodio recommended

follow-up in two months and weekly visits with her therapist. (*Id.*).

On February 24, 2020, Ms. Hunt reported having impulsive relationship decisions, had

been thrown out of her home in Euclid, and was homeless in Geauga County. (Tr. 2072). She was

camping in a park with her girlfriend at the time. (*Id.*). Ms. Hunt reported managing dizziness side

effects from prazosin due to its significant nightmare reduction. (Tr. 2072-73). Ms. Hunt reported

"not as much depression." (Tr. 2073).

On May 21, 2020, Dr. Rodio noted Ms. Hunt experiences withdrawal if she misses taking

her Effexor, and was very emotional when off Lamictal. (Tr. 2253-54). Ms. Hunt hoped to increase

Vyvanse to achieve better concentration and focus; Dr. Rodio stated he wished to focus first on

stabilizing her mood and getting a stable address. (Tr. 2254). Dr. Rodio increased her Lamictal

dosage. (*Id.*). Dr. Rodio included borderline personality disorder to Ms. Hunt's diagnoses. (Tr. 2255-56).

## IV. MEDICAL OPINIONS[2]

Dr. Rodio submitted two medical opinions,[3] titled *Off-Task/Absenteeism Questionnaire*, and *Medical Statement Concerning Depression, Bipolar, and Related Disorders*, respectively. (Tr. 2229, 2233).

In the *Off-Task Questionnaire*, Dr. Rodio opined that Ms. Hunt would "likely be off-task at least 20% of the time (exclusive of ½ hr. lunch break and 2 – 15 minute breaks even without substance abuse if any)." (Tr. 2229). He further indicated Ms. Hunt would be absent about four times per month. (*Id.*). In support, Dr. Rodio noted that "[Ms. Hunt] has mood swings resulting in poor attention" due to her underlying mental or physical impairments. (*Id.*). Dr. Rodio also indicated that Ms. Hunt would experience an inability to concentrate, pay attention, and/or focus on a sustained basis because "her decision making is erratic." (*Id.*).

When completing the form, the *Off-Task Questionnaire* instructed the physician as follows:

> If drug addiction and alcoholism (DAA) is a contributing factor material to the claimant's impairment, please confine your assessment to his/her condition if he/she stops using alcohol/drugs; if it's not possible to separate the mental restrictions and limitations imposed by DAA from the various other mental disorders, then please so indicate.

---

[2]     Ms. Hunt only raises error with respect to the ALJ's consideration of Dr. Rodio's opinions. (*See* Pl.'s Br., ECF #14, PageID 2495-99; *see also* Pl.'s Fact Sheet, ECF #14-1, PageID 2501-02). She does not raise error with respect to the opinions of State agency reviewers. I therefore only summarize here Dr. Rodio's medical opinions provided at Tr. 2229 and 2233.

[3]     The Commissioner asserts that Ms. Hunt has only raised error with Dr. Rodio's opinion in the *Off-Task/Absenteeism Questionnaire* and therefore waives objection as to the *Medical Statement Concerning Depression, Bipolar, and Related Disorders*. (Comm'r's Br., ECF #15, PageID 2515 n.4). I find Ms. Hunt has not waived her argument as to the *Medical Statement*, because she references the ALJ's handling of both opinions in her argument (Pl.'s Br., ECF #14, PageID 2497), and references the *Medical Statement* in her fact sheet. (Pl.'s Fact Sheet, ECF #14-1, PageID 2502).

(Tr. 2229). Dr. Rodio was silent as to Ms. Hunt's drug or alcohol use, if any. (*See id.*).

In the *Medical Statement*, Dr. Rodio noted Ms. Hunt's PTSD diagnosis as the basis for his treatment of her mental health condition. (Tr. 2233). He documented her symptoms as a depressed mood; diminished interest in almost all activities; sleep disturbance; observable psychomotor agitation or retardation; and difficulty concentrating or thinking. (*Id.*). He also indicated Ms. Hunt experiences pressured speech; flight of ideas; decreased need for sleep; distractibility; involvement in activities that have a high probability of painful consequences that are not recognized; and increase in goal-directed activity or psychomotor agitation (*e.g.*, manic behavior). (*Id.*). In Dr. Rodio's opinion, Ms. Hunt has marked limitations in her ability to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace at tasks. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated August 14, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since March 9, 2016, her alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq*).

3. The claimant has the following severe impairments: diabetes, essential hypertension, obstructive sleep apnea, migraines, obesity, depression, bipolar disorder, anxiety, posttraumatic stress disorder (PTSD), borderline personality disorder, attention deficit hyperactivity disorder (ADHD), and substance addiction disorders (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967 (c) except the claimant can frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; able to work in (up to and including) a loud noise environment; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to occasionally interact with supervisors and coworkers and never interact with the public[.]

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on October 31, 1982 and is a younger individual age 18-49, on the date last insured (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from March 9, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920 (g)).

(Tr. 44-51).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

14

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Hunt asserts the ALJ's decision was not supported by substantial evidence because the ALJ did not provide "good reasons" for assigning little weight to Dr. Rodio's medical opinions as regulations require. (Pl.'s Br., ECF #14, PageID 2495; Pl.'s Reply Br., ECF #16, PageID 2522). Specifically, she asserts the ALJ's stated reasons for not assigning controlling weight to Dr. Rodio's opinion contained factual errors, and the ALJ did not complete the second part of the two-part analysis under the treating physician rule by failing to consider fully the factors prescribed under the regulations. (Pl.'s Br., ECF #14, PageID 2495-99; Pl.'s Reply Br., ECF #16, PageID 2522-26).

The Commissioner opposes, stating the ALJ is not bound by a treating physician's opinion where there is medical evidence contrary to the opinion. (Comm'r's Br., ECF #15, PageID 2515). The Commissioner contends Dr. Rodio did not include objective medical findings in his checkbox-style opinion, and the ALJ was correct to afford it little weight. (*Id.* at PageID 2515-17). The Commissioner further asserts that the two reasons the ALJ gave—"he did not set forth substantive explanations for his findings and he also failed to address the claimant's drug use" (Tr. 49)—satisfy the "good reasons" analysis required under the treating physician rule. (*Id.*).

15

For the reasons that follow, I find the ALJ did not appropriately explain his reasons for not affording Dr. Rodio's opinions controlling weight. Accordingly, the ALJ did not comply with the "good reasons" requirement of the treating physician rule.

The parties agree on the analysis required by the treating physician rule. (*Compare* Comm'r's Br., ECF #15, PageID 2515; *with* Pl.'s Reply Br., ECF #16, PageID 2522-23). However, the parties differ as to its application in this case. (*See id.*).

Ms. Hunt filed her application for benefits on June 30, 2016. (Tr. 363-64). Because her application was dated before March 27, 2017, the Social Security Administration's prior rules governing the evaluation of opinion evidence—known as the "treating physician rule"—apply. *See* 20 C.F.R. § 404.1527(c)(2). The treating physician rule provides that the treating physician's opinion controls if the ALJ finds the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Id.*

But "the ALJ is not bound by a treating physician's opinion if there is substantial medical evidence to the contrary." *Tipton v. Comm'r of Soc. Sec.*, 847 F. App'x 290, 294 (6th Cir. 2021) (*citing* 20 C.F.R. § 404.1527(c)(2)). In that instance, the ALJ applies the factors found in §§ 404.1527(c)(2)–(6) when determining the weight to give the medical opinion: length of treatment relationship and frequency of examination; nature and extent of the treatment relationship; supportability; consistency; specialization; and other factors which tend to support or contradict the medical opinion. In all cases, the ALJ is required to "always give good reasons" in the decision for the weight afforded a treating physician's opinion. 20 C.F.R. § 404.1527(c). The ALJ's reasoning "must be 'supported by the evidence in the case record, and must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (*quoting* SSR 96-2p). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (*quoting Wilson*, 378 F.3d at 544).

> Here, the ALJ provided the following analysis of Dr. Rodio's opinion:

> Little weight is further given to the medical statement completed by James Rodio, M.D. dated May 5, 2020 which found that the claimant has marked limitations in understanding, remembering, or applying information, interacting with others, and in concentration, persistence or maintaining pace and an extreme limitation in adapting or managing oneself and to the Off-Task/Absenteeism questionnaire also completed by Dr. Rodio on May 5, 2020, which found that the claimant would be off task at least 20% of the work day and absent about four times a month because he did not set forth substantive explanations for his findings and he also failed to address the claimant's drug use (Exhibits 52F, 53F).

(Tr. 49). The ALJ cites to the exhibits containing each of Dr. Rodio's checkbox *Off-Task/Absenteeism Questionnaire* and *Medical Statement* opinions, but provides no further explanation or citation to the record in support of his finding to afford "little weight" to Dr. Rodio's opinion. (*See id.*).

> The Commissioner asserts the ALJ met the "good reasons" requirement and was right to afford "little weight" to Dr. Rodio's opinion because it is a conclusory, check-the-box opinion form and as such, it fails to include any clinical findings or evidence in support of Dr. Rodio's conclusions regarding Ms. Hunt's limitations. (Comm'r's Br. ECF #15, PageID 2516). For two reasons, this rationale is faulty.

> First, the form Dr. Rodio's opinions take does not absolve the ALJ of the requirement to explain the weight given in a manner sufficient to make clear to Ms. Hunt the disposition for her

case and for the court to conduct meaningful review. The weight afforded a physician's opinion is for the ALJ to determine, "but it is still an opinion the ALJ must consider." *Doyle v. Comm'r of Soc. Sec.*, No. 2:11-CV-371, 2012 WL 4829434, at *9 (E.D. Tenn. Sept. 21, 2012), *report and recommendation adopted*, 2012 WL 4829213 (E.D. Tenn. Oct. 10, 2012) (discussing the ALJ's consideration of two check-box forms completed by a treating physician). A claimant is not entitled to have her doctor's opinion be afforded controlling weight in all circumstances, "but she is entitled to be told why the Commissioner has decided . . . to disagree with" her doctor. *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The reason-giving requirement is twofold—it helps claimants understand the disposition of their cases, and it permits meaningful review by the courts. *Wilson*, 378 F.3d at 544 (*quoting Snell*, 177 F.3d at 134).

Second, Dr. Rodio's check-box form can be read in the context of his contemporaneous treatment notes. I agree that, if those two pages are taken alone, Dr. Rodio's opinions do not provide substantive support for his conclusions that Ms. Hunt has marked limitations in understanding, remembering, or applying information, interacting with others, and in concentration, persistence or maintaining pace and an extreme limitation in adapting or managing herself (Tr. 2233), and that she would be off task at least 20 percent of the workday and absent about four times a month (Tr. 2229). (Comm'r's Br., ECF #15, PageID 2516). Such check-box forms are "weak evidence at best" when unaccompanied by an explanation or are without reasonable support for the opined limitations. *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016) (finding the treating physician's check-box form was weak evidence and met the Sixth Circuit's patently deficient standard; therefore, strict application of the regulations was not required because the ALJ referenced previously-discussed medical evidence in his explanation).

18

That is not quite the case here, however. Unlike in *Hernandez*, the ALJ here does not reference Dr. Rodio's treatment notes when choosing to give little weight to Dr. Rodio's opinions. As summarized above, Ms. Hunt's record contains Dr. Rodio's treatment notes, taken over a period of four years from May 2016 through May 2020, and contemporaneous with his opinion forms dated May 5, 2020. (*Compare supra* at 5-9 *with* Tr. 2229, 2233). Dr. Rodio's treatment notes contain Ms. Hunt's numerous hospitalizations due to her mental health (*e.g.*, Tr. 760, 2098-99), multiple suicide attempts (*e.g.*, Tr. 753, 760), Dr. Rodio's attempts to manage Ms. Hunt's mental health needs against the side effects of her medications (*e.g.*, Tr. 757, 759-60, 2100, 2147, 2160, 2072-73), and her extreme mood swings (*e.g.*, Tr. 2050-51, 2098, 2197, 2215). Check-box forms may constitute unreliable evidence when unaccompanied by treatment notes or unsupported by the record as a whole. *Doyle*, 2012 WL 4829434, at *9 (collecting cases). But a treating physician's opinion must still be squared with the "good reasons" rule, particularly when it is accompanied by contemporaneous treatment notes. *Id.* at *10. "Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

Because Dr. Rodio's opinion should have been considered and explained by the ALJ, I turn to whether the explanation given satisfies the requirements of 20 C.F.R. §§ 404.1527(c)(2)–(6). Here, the ALJ did not give Dr. Rodio's opinion controlling weight "because he did not set forth substantive explanations for his findings and he also failed to address the claimant's drug use." (Tr. 49).

An ALJ is not required to explain every factor prescribed under the regulations; rather, the ALJ balances the regulatory factors to determine the weight given to a treating source opinion. *See*

20 C.F.R. §§ 404.1527(c)(2)–(6) *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011). Remand becomes necessary when the ALJ has not "comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (internal quotations omitted). This explanation—to give the ALJ the benefit of the doubt—is silent as to the prescribed factors of length of treatment, frequency of examination, consistency of Dr. Rodio's opinion against the rest of the evidence of record, or Dr. Rodio's specialization. *Compare* Tr. 49 *with* 20 C.F.R. §§ 404.1527(c)(2)–(6). At best, the ALJ's explanation appears to touch on the "supportability" factor ("he did not set forth substantive explanations for his findings") and the "other reasons" factor ("he also failed to address the claimant's drug use.").

Ms. Hunt concedes the ALJ may have considered Dr. Rodio's treatment notes in the decision, citing the following excerpt from the decision:

> She has had multiple emergency room treatments and hospitalizations for her symptoms of depression and suicidal thoughts including in March 2016, August 2016, February 2018, and in July 2020. Her treatment has included individual counseling and medication including Cymbalta, Effexor, prazosin. She also received electroconvulsive therapy from November 2016 through February 2017.

(Pl.'s Reply Br., ECF #16, PageID 2523-24) (citing Tr. 47) (internal citations omitted). Reviewing the pertinent portion from the ALJ's decision in its entirety, I also see multiple generic references to "treatment records." (Tr. 47). However, this portion of the decision does little to advance the type of comprehensive explanation that could facilitate this Court's meaningful review because it neither indicates Dr. Rodio by name, nor does it connect the treatment records with the weight given Dr. Rodio's opinion. (*Compare* Tr. 47 *with* Tr. 49).

It is not for this Court to speculate as to the ultimate question of Ms. Hunt's disability, but it is for the ALJ to explain his findings. Without more explanation from the ALJ, I cannot

reconcile these discrepancies. The ALJ must create "a logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877. I find he has not done so here.

Next, Ms. Hunt argues the ALJ's explanation that Dr. Rodio "failed to address the claimant's drug use" (Tr. 49) was factually inaccurate. (Pl.'s Br., ECF #14, PageID 2497-98). She points out that the *Off-Task/Absenteeism Questionnaire* included the following instruction for the physician:

> If drug addiction and alcoholism (DAA) is a contributing factor material to the claimant's impairment, please confine your assessment to his/her condition if he/she stops using alcohol/drugs; if it's not possible to separate the mental restrictions and limitations imposed by DAA from the various other mental disorders, then please so indicate.

(Tr. 2229). Such an instruction leads to the logical conclusion that Dr. Rodio's opinion was "confine[d] . . . to [Ms. Hunt's] condition if she stops using alcohol/drugs," *i.e.*, that Dr. Rodio determined that drug addiction was not a "contributing factor material to [Ms. Hunt's] impairment" and that he was able to "separate" any limitations caused by her addiction "from the various other mental disorders." (*Id.*). Dr. Rodio's treatment notes confirm that he treated Ms. Hunt during periods of sobriety (*e.g.*, Tr. 754, 2015, 2196-97) and presumably could accurately assess whether Ms. Hunt would be limited by her mental illnesses (*i.e.*, PTSD) even if she stopped using drugs. The ALJ's apparent failure to compare the instructions in the form against Dr. Rodio's treatment notes does not serve as substantial evidence for this explanation. *See Gayheart*, 710 F.3d at 378 (remanding for failure to provide "good reasons" where, in part, the ALJ's explanation for declining to give a treating source's opinion controlling weight was "either taken out of context or offset by other examples in the record.").

Moreover, setting aside the factual inaccuracy, the sparse statement that Dr. Rodio "failed to address [Ms. Hunt's] drug use" (Tr. 49) does not clarify how or if the ALJ considered Ms. Hunt's alleged drug use when determining the weight given to Dr. Rodio's opinions. A claimant's drug abuse "is not a factor to be considered when determining the weight to be given to a treating-source opinion." *Gayheart*, 710 F.3d at 381 (*citing* 20 C.F.R. § 404.1527(c)). To the extent the ALJ may have considered Ms. Hunt's alleged drug abuse as a factor in determining the weight given to Dr. Rodio's opinions, such justification is impermissible.

Nevertheless, Dr. Rodio did as the form indicated, and was not required to address any alleged drug addiction by Ms. Hunt. Substantial evidence, therefore, does not support the ALJ's finding as to this issue.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying disability insurance benefits not supported by substantial evidence and recommend the decision be **REVERSED** and **REMANDED** for additional proceedings consistent with this recommendation.

Dated: May 11, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

22

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).